IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

JULIE R. ALBERTSON,

  Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

  Defendant.

No. C15-2001

RULING ON JUDICIAL REVIEW

TABLE OF CONTENTS

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . 2

III.   PRINCIPLES OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
  A.   Albertson's Education and Employment Background . . . . . . . . . . . 5
  B.   Vocational Expert's Testimony from February 21, 2013
    Supplemental Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
  C.   Albertson's Medical History . . . . . . . . . . . . . . . . . . . . . . . 6

V.   CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
  A.   ALJ's Disability Determination . . . . . . . . . . . . . . . . . . . . . 11
  B.   Objections Raised By Claimant . . . . . . . . . . . . . . . . . . . . . 13
    1.   Listing § 2.07 . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    2.   Dr. Hansen's Opinions . . . . . . . . . . . . . . . . . . . . . 16
  C.   Reversal or Remand . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VII.   ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Julie R. Albertson on January 13, 2015, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits for the time period of September 19, 2009 to June 11, 2012.[1] Albertson asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner"), determine she was disabled from September 19, 2009 to June 11, 2012, and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Albertson requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On June 13, 2007, Albertson applied for disability insurance benefits, alleging her disability began on March 11, 2006. The application was denied, and an administrative hearing was held on August 3, 2009, before Administrative Law Judge ("ALJ") Marilyn P. Hamilton.[2] At the hearing, Albertson requested a closed period of disability from March 11, 2006 through May 22, 2008. In a decision dated September 18, 2009, the ALJ determined that Albertson was under a disability, and entitled to disability insurance benefits from March 11, 2006 through May 22, 2008.

On November 16, 2009, Albertson applied for both disability insurance benefits and SSI benefits. In her applications, Albertson alleged an inability to work since September 19, 2009 due to vertigo, dizziness, and constant headaches. Albertson's applications were denied on January 15, 2010. On April 30, 2010, her applications were denied on reconsideration. On June 3, 2010, Albertson requested an administrative hearing before

---

[1] On February 17, 2015, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

[2] Albertson requested the hearing on April 11, 2008.

2

an ALJ. On September 13, 2011, Albertson appeared via video conference with her attorney before ALJ Thomas M. Donahue for an administrative hearing. In a decision dated October 21, 2011, the ALJ denied Albertson's claims. Albertson appealed the ALJ's decision. On October 24, 2012, the Appeals Council vacated the ALJ's decision and remanded the matter to the ALJ for further consideration of treating source opinions and new medical evidence.

On February 21, 2013, Albertson appeared via video conference with her attorney before ALJ Donahue for a supplemental administrative hearing. In a decision dated April 8, 2013, the ALJ determined that Albertson was disabled and entitled to benefits beginning on June 11, 2012. The ALJ also determined that prior to June 11, 2012, from September 19, 2009, Albertson's alleged disability onset date, through June 10, 2012, Albertson was not disabled. Albertson appealed the ALJ's decision. On November 12, 2014, the Appeals Council denied Albertson's request for review. Consequently, the ALJ's April 8, 2013 decision was adopted as the Commissioner's final decision.

On January 13, 2015, Albertson filed this action for judicial review. The Commissioner filed an Answer on March 27, 2015. On April 27, 2015, Albertson filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that she was not disabled and that she was functionally capable of performing work that exists in significant numbers in the national economy during the time period of September 19, 2009 through June 10, 2012. On June 11, 2015, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On June 22, 2015, Albertson filed a reply brief.

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3),

the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court "'must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.'" *Bernard v. Colvin*, 774 F.3d 482, 486 (8th Cir. 2014) (quoting *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006)). Substantial evidence is defined as less than a preponderance of the evidence, but is relevant evidence a "'reasonable mind would find adequate to support the commissioner's conclusion.'" *Grable v. Colvin*, 770 F.3d 1196, 1201 (8th Cir. 2014) (quoting *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2011)).

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice

within which the [Commissioner] may decide to grant or deny
benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Draper v. Colvin*, 779 F.3d 556, 559 (8th Cir. 2015) ("'If substantial evidence supports the Commissioner's conclusions, th[e] court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome.' *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)."); *Cline v. Colvin*, 771 F.3d 1098, 1102 (8th Cir. 2014) ("'As long as substantial evidence in the record supports the Commissioner's decision, [the court] may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently.' *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).").

## IV. FACTS

### A. *Albertson's Education and Employment Background*

Albertson was born in 1970. She is a high school graduate, and attended three years of college. In the past, Albertson worked as an administrative assistant, cashier, customer complaint clerk, insurance agent, and salesperson.

5

## B. Vocational Expert's Testimony from February 21, 2013 Supplemental Hearing

At the supplemental hearing, the ALJ provided vocational expert Melinda Stahr with a hypothetical for an individual who is capable of:

> Lifting 20 pounds occasionally, 10 pounds frequently; sitting and standing two hours at a time for six of an eight-hour day; walking three blocks; no climbing ladders, ropes, and scaffolds; no working at heights; only occasional climbing of ramps and stairs; only occasional balancing, stooping, kneeling, crouching, crawling, and bending.

(Administrative Record at 52.) The vocational expert testified that under such limitations, Albertson could perform her past relevant work as a salesperson, customer complaint clerk, or cashier. In the alternative, the vocational expert also testified that Albertson could perform the following jobs: (1) hospital admitting clerk, (2) statement clerk, (3) gambling cashier, (4) housekeeper, (5) sales attendant, and (6) information clerk.

Albertson's attorney also questioned the vocational expert:

> Q: If an individual would be absent three or more days per month on a regular basis, would they be able to sustain employment?
> A: It's my professional opinion that that would eliminate competitive employment in the national economy.
> Q: And hypothetical number 3, if a[n] individual would need unscheduled breaks, enough where they'd be off task more than ten percent of the day, would they be able to maintain employment?
> A: It's my opinion that being off task for an hour of the day would make them not competitively employable.

(Administrative Record at 54.)

## C. Albertson's Medical History

On September 21, 2009, Albertson met with Dr. Andrea L. Venteicher, M.D., complaining of vertigo. In reviewing Albertson's medical history, Dr. Venteicher noted that Albertson's difficulties with vertigo started in 2005, following an automobile accident

6

in which she suffered severe head injuries. According to Dr. Venteicher, Albertson "saw several neurologists and it was determined she had benign positional vertigo. She has had a couple of treatments over the years for this through a physical therapist and it has helped a great deal."[3] Dr. Venteicher noted that in the past week, Albertson experienced 3 days of dizziness, vertigo, and nausea. Upon examination, Dr. Venteicher diagnosed Albertson with benign positional vertigo. Dr. Venteicher referred Albertson to physical therapy for treatment.

Albertson returned to Dr. Venteicher on October 13, 2009, following a severe spell of vertigo. Dr. Venteicher noted that the spells typically last for 1 or 2 days, and leave her weak and fatigued. Dr. Venteicher also noted chronic tinnitus in her right ear. Upon examination, Dr. Venteicher diagnosed Albertson with benign positional vertigo with severe vertigo spell. Dr. Venteicher prescribed medication and encouraged Albertson to continue seeing her physical therapist as treatment.

On October 16, 2009, Albertson met with physical therapist Mary A. Kerrigan. Upon testing and examination, Kerrigan opined that:

> Testing indicates a recurrence of [Albertson's] bilateral posterior canalithiasis (BBPV), right greater than left resulting in symptoms of acute vertigo, nausea and imbalance that can increase her fall risks. Additionally, she does present with an increase of right ear tinnitus, fullness and hearing loss and episodic acute vertigo episodes with nausea and vomiting persisting hours which warrants further investigation. Romberg testing also shows a significant balance impairment.

(Administrative Record at 389.) Kerrigan recommended further physical therapy as treatment.

Albertson returned to Dr. Venteicher's office on November 3, 2009, and met with Jenny L. Stegen, PA-C, regarding persistent vertigo spells. Albertson reported:

---

[3] Administrative Record at 391.

7

> vertigo spells almost on a daily basis every morning. Typically, she will have a bout of vertigo in the morning or even occasionally in the middle of the night. . . . And then, after she gets vertiginous, she will feel nauseous and then develop a headache and all this will last for a couple of hours. Afterward, she will be very worn out.

(Administrative Record at 381.) Stegen also noted that Albertson attended three appointments for vestibular rehabilitation and physical therapy without getting any relief. Upon examination, Stegen diagnosed Albertson with chronic debilitating vertigo and headaches. Stegen referred Albertson to a specialist for treatment of her vertigo.

On January 26, 2010, Albertson met with Dr. Marlan R. Hansen, M.D., a specialist at the University of Iowa Hospitals and Clinics ("UIHC"). Albertson's chief complaint was history of severe vertigo spells. Dr. Hansen noted that Albertson's spells started in 2005, but now are occurring "every few weeks." Dr. Hansen characterized her symptoms as true vertigo, hearing loss, and daily headaches. Dr. Hansen indicated that her spells were "disabling" and lasted several hours. Upon testing, Dr. Hansen found severe rising to moderate sensorineural hearing loss in Albertson's right ear, and left caloric paresis and asymmetric VOR. Dr. Hansen diagnosed Albertson with Meniere's disease, an inner ear disorder that causes spontaneous episodes of vertigo. Dr. Hansen prescribed medication as treatment.

Albertson returned to Dr. Hansen on March 4, 2010, complaining of worsening vertigo spells. Upon examination, Dr. Hansen continued his diagnosis of Meniere's disease. Dr. Hansen recommended an AD endolymphatic shunt as treatment. On April 1, 2010, Albertson, again, met with Dr. Hansen for a preoperative appointment. Albertson complained of daily dull headaches. Upon examination, Dr. Hansen continued to diagnose Albertson with Meniere's disease. On April 15, 2010, Dr. Hansen implanted an endolymphatic shunt to allow fluid to drain in the endolymphatic sac of the inner ear, and treat Meniere's disease.

On April 28, 2010, at the request of Albertson's attorney, Dr. Hansen filled out a "Physical Residual Functional Capacity Questionnaire" for Albertson. Dr. Hansen diagnosed Albertson with Meniere's disease. Dr. Hansen noted that Albertson's symptoms included hearing loss, vertigo, dizziness, and fatigue. Dr. Hansen indicated that Albertson's condition would "occasionally" interfere with her attention and concentration when performing even simple work tasks. Dr. Hansen believed Albertson would be capable of low stress jobs. Dr. Hansen estimated that Albertson would miss about three days of work per month due to her impairment or treatment for her impairment.

Albertson returned to Dr. Hansen on June 15, 2010, complaining of multiple episodes of vertigo since her surgery on April 15, 2010. Dr. Hansen noted Albertson "[h]as AS vestibular hypofunction. Had a two week spell with almost daily attacks followed by a 16hr spell on 6/4. Since then has had no attacks. Has felt like she was going to have an attack twice but took meclizine."[4] Upon examination, Dr. Hansen continued his diagnosis of Meniere's disease.

In a letter dated July 14, 2010, Dr. Hansen offered Albertson's attorney the following opinion:

> I saw [Albertson] in followup on July 13, 2010. She has Meniere's disease in her right ear. This has caused significant sensorineural hearing loss in her right ear. It also gives her frequent severe attacks of vertigo, which prohibit her from working in any reasonable environment. The spells require her to be down, and do not allow her to function while she is having the spells, and she is having nearly daily attacks. On April 15, she underwent an endolymphatic shunt surgery on the right ear; however, she has continued to have severe attacks. In up to one third of patients the shunt offers no benefit; it appears to have not provided any benefit to [Albertson]. . . .

---

[4] Administrative Record at 683.

9

> At this point, it is difficult to predict how long she will continue to have spells, but I would consider her to continue to be permanently disabled until the spells completely abate, and she is able to undergo some vestibular rehabilitation programs to regain her balance. It is unlikely she will recover meaningful hearing in the right ear. . . .

(Administrative Record at 617.)

Albertson next met with Dr. Hansen on August 11, 2011. At this meeting, Dr. Hansen found that Albertson:

> presents still having frequent spells of Meniere's, [right] hearing loss and [left] diminishing hearing. The last mild spell was July 18th, and the last major spell in May. Episodes of dizziness 3-5[ times per week]. Spells have become worse since hernia surgery in Feb[ruary].

(Administrative Record at 761.) An ENG showed "fairly" symmetric caloric responses. Hearing tests showed "significant" sensorineural hearing loss in the right ear. Dr. Hansen diagnosed Albertson with intractable Meniere's disease. Dr. Hansen suggested that a labyrinthectomy, a surgical procedure used to manage unilateral peripheral vestibular dysfunction in the presence of a nonserviceable hearing ear, be performed as treatment.

On March 1, 2012, Albertson had a follow-up appointment with Dr. Hansen. In addition to frequent spells of Meniere's disease and "profound" hearing loss in her right ear, Albertson recently started having frequent drop attacks (Tumarkin crisis). Drop attacks are associated with Meniere's disease, and occur when an individual falls to the ground with no warning. Upon examination, Dr. Hansen diagnosed Albertson with intractable Meniere's disease with Tumarkin attacks, and profound hearing loss in her right ear. Dr. Hansen, again, discussed surgical options for Albertson, including a labyrinthectomy and/or cochlear implant. On June 11, 2012, Albertson underwent surgery for a cochlear implant on the right, and destructive labyrinthotomy, also on the right.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Albertson was not disabled during the time period of September 19, 2009, through June 10, 2012. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Moore v. Colvin*, 769 F.3d 987, 988 (8th Cir. 2014); *Young v. Astrue*, 702 F.3d 489, 490-91 (8th Cir. 2013). The five steps an ALJ must consider are:

> (1) whether the claimant is currently employed; (2) whether the claimant is severely impaired; (3) whether the impairment is or approximates an impairment listed in Appendix 1; (4) whether the claimant can perform past relevant work; and, if not, (5) whether the claimant can perform any other kind of work.

*Hill v. Colvin*, 753 F.3d 798, 800 (8th Cir. 2014) (citing *King v. Astrue*, 564 F.3d 978, 979 n. 2 (8th Cir. 2009)); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the

11

fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "'bears the burden of demonstrating an inability to return to [his] or her past relevant work.'" *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (quoting *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "'the claimant has the physical residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with [his or] her impairments and vocational factors such as age, education, and work experience.'" *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012) (quoting *Holley v. Massanari*, 253 F.3d 1088, 1093 (8th Cir. 2001)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a)(1); *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014). The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or] her limitations.'" *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Albertson had not engaged in substantial gainful activity since September 19, 2009. At the second step, the ALJ concluded from the medical evidence that Albertson had the following severe impairments: vertigo, Meniere's disease, and obesity. At the third step, the ALJ found that prior to June 11, 2012, the date Albertson became disabled, she did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

At the fourth step, the ALJ determined that prior to June 11, 2012, Albertson had the following RFC:

> [Albertson] had the residual functional capacity to perform light work . . . lifting 20 pounds occasionally and 10 pounds frequently, sitting or standing two hours at a time for no more than six hours in an eight-hour day, and walking distances no greater than three blocks at a time. In addition, [Albertson] could not climb ladders, ropes, or scaffolds, or work at heights. Moreover, she could only occasionally climb ramps or stairs, and only occasionally balance, stoop, kneel, crouch, or bend.

(Administrative Record at 29.) At the fourth step, the ALJ determined that prior to June 11, 2012, Albertson was capable of performing her past relevant work as a salesperson, customer complaint clerk, and cashier. In the alternative, at the fifth step the ALJ also determined that prior to June 11, 2012, and based on her age, education, work experience, and RFC, Albertson was capable of performing jobs that exist in the national economy. Therefore, the ALJ concluded that Albertson was not disabled during the time period of September 19, 2009 through June 10, 2012.

### B. Objections Raised By Claimant

Albertson argues that the ALJ erred in two respects. First, Albertson argues that the ALJ erred by not finding her presumptively disabled because she meets all the requirements for Listing § 2.07. Second, Albertson argues that the ALJ failed to properly evaluate the opinions of her treating specialist, Dr. Hansen.

#### 1. Listing § 2.07

At step three of the five-step sequential analysis, an ALJ is required to determine whether a claimant's alleged impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. If a claimant's impairment, in fact, meets one of the impairments in the "Listings," then the ALJ must find that he or she is disabled. Albertson argues that she is presumptively disabled because she meets or equals

13

Listing § 2.07. Albertson points out that even though she meets the requirements of Listing § 2.07, in his decision, the ALJ did not address that particular Listing. Thus, Albertson maintains that the ALJ's failure to address Listing § 2.07, and find her disabled based on the Listing requires remand for further consideration by the ALJ.

Listing § 2.07 provides:

> 2.07 *Disturbance of labyrinthine-vestibular function (including Meniere's disease)*, characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing. With both A and B:
>
> A. Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and
>
> B. Hearing loss established by audiometry.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.07(A)-(B). The burden is on the claimant to show that his or her impairment meets or equals a listing. *Carlson v. Asture*, 604 F.3d 589, 593 (8th Cir. 2010) (citing *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004)). Furthermore, in order to meet a listing, "'an impairment must meet all of the listing's specified criteria.'" *Id.*; *see also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his [or her] impairment matches a listing, it must meet *all* of the specified medical criteria.").

Here, the record clearly supports a history of frequent attacks of balance disturbance, in the form of vertigo/Meniere's spells, drop attacks, and dizziness.[5]

---

[5] *See* Administrative Record at 391-92 (experiences of vertigo and dizziness in September 2009); 390 (experiences of vertigo in October 2009); 381 (daily vertigo in November 2009); 571 (weekly vertigo spells in January 2010); 672 (placement of an endolymphatic shunt to treat balance problems/Meniere's disease in April 2010); 683 (multiple episodes of vertigo in June 2010); 761 (August 2011 medical records reporting multiple vertigo spells in May, June, and July 2011); 985 (Meniere's spells and frequent drop attacks in March 2012); 1155-56 (surgery for cochlear implant and destructive
(continued...)

Vestibular testing in January 2010 showed left caloric paresis and asymmetric VOR on rotary chair, supporting disturbance in vestibular function.[6] At the same time period, Dr. Deema A. Fattal, a consulting neurologist, diagnosed Albertson with left peripheral vestibulopathy, vertigo, and balance problems.[7] Additionally, in April 2010, Albertson underwent surgery to have an endolymphatic shunt implanted to treat Meniere's disease and her balance problems. Finally, in June 2012, Albertson underwent further surgery to treat her Meniere's disease and balance problems, including a destructive labyrinthectomy and cochlear implant on her right side. Lastly, audiometry testing also showed a history of progressive and consistent hearing loss in her right ear.[8]

It is clear that there is evidence in the record to support a finding that Albertson meets Listing § 2.07. Even though the ALJ determined at step two that Albertson's severe impairments included vertigo and Meniere's disease, the ALJ failed at step three to address whether Albertson's impairments meet or equal Listing § 2.07, which deals directly with vertigo and Meniere's disease. Under such circumstances, the Court finds that remand is necessary for further consideration and findings at step three of the sequential evaluation. *See Chunn v. Barnhart*, 397 F.3d 667, 672 (8th Cir. 2005) (providing that failure of an ALJ to support his or her findings at step three that a claimant's impairments do not meet

---

[5](...continued)
labyrinthectomy to treat Meniere's disease and balance problems in June 2012).

[6] *Id.* at 575.

[7] *Id.* at 639.

[8] *See* Administrative Record at 385 (finding of prolonged hearing loss in the right ear in October 2009); 575 (severe to moderate hearing loss in the right ear in January 2010); 580 (mild to severe sensorineural hearing loss in the right ear in March 2010); 634-36 (hearing tests from April, May, and July 2010 showing poor hearing in the right ear); 652 (poor hearing in the right ear in August 2011); 1155-56 (surgery for cochlear implant on the right in June 2012).

or equal a listed impairment, or even consider the pertinent Listing(s), requires remand for further consideration and findings).

### 2. *Dr. Hansen's Opinions*

Albertson argues that the ALJ failed to properly evaluate the opinions of her treating specialist, Dr. Hansen. Specifically, Albertson argues that the ALJ failed to properly weigh Dr. Hansen's opinions. Albertson also argues that the ALJ's reasons for discounting Dr. Hansen's opinions are not supported by substantial evidence in the record. Albertson concludes that this matter should be remanded for further consideration of Dr. Hansen's opinions.

The ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence of the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ). The ALJ may discount or

16

disregard a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hamilton v. Astrue*, 518 F.3d 607, 609 (8th Cir. 2008).

Also, the regulations require an ALJ to give "good reasons" for assigning weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(c)(2). An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion from a treating source is not given controlling weight, then the ALJ considers the following factors for determining the weight to be given to all medical opinions: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(c)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). The decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. SSR *96-2P*, 1996 WL 374188 (1996).

In his decision, the ALJ addressed the opinions of Dr. Hansen as follows:

> The undersigned acknowledges that Dr. Hansen indicated his belief [Albertson] is "permanently disabled" until her attacks resolve, as well as the fact he completed a residual functional capacity questionnaire opining [Albertson] would be absent from work three days per month as a result. While the undersigned appreciates [] Dr. Hansen's submissions, the undersigned gives him little weight for multiple reasons. First, Dr. Hansen appears only [to] have treated [Albertson] on two, possibly three occasions at the time he [] completed the

> questionnaire. Second, at the time Dr. Hansen completed that questionnaire, [Albertson] was reporting having severe attacks every three to six weeks. That would not amount to three absences per month. Finally, as previously noted, at the time Dr. Hansen completed that questionnaire in April 2010, [Albertson] was reporting good attenuation of her Meniere's attacks, and would only report increased frequency that June. As such, the undersigned gives little weight to Dr. Hansen's assessments, since his treatment records do not show frequency of symptoms consistent with his restrictions.

(Administrative Record at 34.)

In reviewing the ALJ's decision, the Court bears in mind that an ALJ has a duty to develop the record fully and fairly. *Cox*, 495 F.3d at 618. Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quotation omitted). Furthermore, if an ALJ rejects the opinions of a treating physician, the regulations require that the ALJ give "good reasons" for rejecting those opinions. *See* 20 C.F.R. § 404.1527(d)(2).

The Court finds that the ALJ has not fully met these requirements. The record demonstrates that Dr. Hansen, a specialist at the UIHC, met with and examined Albertson on three occasions prior to filling out the April 2010 RFC questionnaire. Additionally, prior to filling out the questionnaire, Dr. Hansen also performed surgery on Albertson, implanting an endolymphatic shunt to treat her Meniere's disease and balance problems. Dr. Hansen continued to treat Albertson for Meniere's disease and balance problems through 2012, when he performed a second surgery, including a destructive labyrinthectomy and cochlear implant on her right side, also to treat her Meniere's disease and balance problems. Furthermore, while the ALJ states that Albertson had severe attacks "every three to six weeks," the ALJ points to no evidence in the record to support this assertion. The ALJ also fails to explain how such attacks preclude Albertson from

missing 3 days of work per month. For example, it is possible that if Albertson had multiple attacks in one week at three, four, or even five-week intervals, that she could miss three days of work in a month. Finally, the ALJ claims that Albertson's attacks were under control at the time Dr. Hansen filled out the questionnaire, and did not become out of control until after he provided his opinions. Again, the ALJ offers no evidence from the record to support this assertion.

Therefore, under such circumstances, and having reviewed the entire record, the Court concludes the ALJ has failed to give "good reasons" for rejecting the opinions of Dr. Hansen. *See Tilley*, 580 F.3d at 680 ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion."). The Court further finds that the ALJ failed in his duty to fully and fairly develop the record with regard to Dr. Hansen's opinions. Accordingly, the Court determines that this matter should be remanded for further consideration of Dr. Hansen's opinions. On remand, the ALJ shall provide clear reasons for accepting or rejecting Dr. Hansen's opinions and support his reasons with evidence from the record.

### C. *Reversal or Remand*

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*, 833 F.2d at 127. Instead, the ALJ failed to: (1) address whether Albertson meets or equals Listing § 2.07 at step three of the five-step sequential evaluation; and (2) properly consider the opinions of Albertson's treating specialist, Dr. Hansen.

## VI. CONCLUSION

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ must consider and make findings at step three of the five-step sequential evaluation, regarding whether Albertson meets or equals Listing § 2.07. The ALJ must also fully and fairly develop the record with regard to the opinions of Dr. Hansen. The ALJ must provide clear reasons for accepting or rejecting Dr. Hansen's opinions. The ALJ must support his reasons for accepting or rejecting Dr. Hansen's opinions with evidence from the record.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this 9th day of October, 2015.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA